NEW PALM GARDENS, INC. vs. ALCOHOLIC BEVERAGES
CONTROL COMMISSION.

Suffolk. January 12, 1981. — May 8, 1981.

Present: GRANT, CUTTER, & DREBEN, JJ.

*Alcoholic Beverages Control Commission. Alcoholic Liquors. Adminis-trative Law, Proceedings before agency, Findings. Obscenity, Com-munity standard.*

An incorrect statutory citation in the notice of hearing furnished by the Alcoholic Beverages Control Commission to a licensee and in the com-mission's decision did not render the proceeding defective in the absence of any showing of prejudice. [787-788]

The Alcoholic Beverages Control Commission could properly suspend a li-cense to sell alcoholic beverages on the basis of its finding that the licensee had violated a criminal statute, regardless of the existence or outcome of any criminal proceeding [788-790], and the correct stand-ard of review is whether the commission's action is supported by sub-stantial evidence [790].

Where the Alcoholic Beverages Control Commission suspended a license to sell alcoholic beverages on the ground that the licensee had permit-ted obscene dancing on its premises, no constitutionally protected in-terests in free expression required that the commission's finding of obscenity be based on proof beyond a reasonable doubt. [790-791]

A finding by the Alcoholic Beverages Control Commission that the holder of a license to sell alcoholic beverages had permitted obscene dancing on its premises was properly based on the report of the commission's inspector respecting the sexual conduct of two female dancers, not-withstanding the inspector's departure before the entertainment was completed. [792-793]

At a hearing before the Alcoholic Beverages Control Commission coun-sel's request that the commissioners articulate the "community stand-ards" of obscenity was improper and no inference of lack of knowledge might be drawn from their failure to do so. [793-794]

Failure of the Alcoholic Beverages Control Commission to find specifical-ly that the statutory test of obscenity had been met was not a fatal defect in a proceeding against an alcoholic beverages licensee for per-mitting obscene dancing on its premises, where the ultimate decision was plainly warranted by the commission's findings of what occurred, which were themselves supported by substantial evidence. [794-795]

In a proceeding before the Alcoholic Beverages Control Commission for suspension of a license to sell alcoholic beverages on the ground that the licensee had permitted obscene dancing on its premises, the Commonwealth was not obliged to present expert testimony negating any artistic or other value of the allegedly obscene conduct, nor was a finding of a violation of G. L. c. 262, § 29, precluded by the claim that the premises were an area of "privacy" or that the audience consisted of consenting adults. [795-796]

Evidence before the Alcoholic Beverages Control Commission was sufficient to support a finding that the person in charge of licensed premises at the time obscene dances took place permitted the dances to occur in violation of G. L. c. 272, § 29, and a regulation of the commission. [796-798]

The lack of certain findings by the Alcoholic Beverages Control Commission did not require that a proceeding be remanded to the agency, where the evidence was uncontroverted and the findings to be made would not involve the expertise of the agency. [799]


CIVIL ACTION commenced in the Superior Court Department on October 26, 1979.

The case was heard by *Nolan, J.*, on a motion for judgment on the pleadings.

*Kenneth H. Tatarian* for the plaintiff.

*Maureen L. Fox*, Assistant Attorney General, for the defendant.

DREBEN, J.  After the Alcoholic Beverages Control Commission (commission) suspended for eight days the plaintiff's license to sell alcoholic beverages, the plaintiff sought judicial review of the commission's decision under G. L. c. 30A, § 14.  Both parties moved for judgment on the pleadings[1] and the commission's motion was allowed. Judgment was entered in the Superior Court dismissing the complaint.  A stay of the suspension was granted by a single justice of this court.

The suspension of the plaintiff's license was based on a determination by the commission that the plaintiff had violated a regulation of the commission by permitting ob-

---

[1] The record of the proceedings before the commission constituted the commission's answer.

scene dancing on the premises in violation of G. L. c. 272, § 29.[2] The regulation, 204 Code Mass. Regs. § 2.05(2) (1978),[3] also referred to by the parties as Regulation 21, prohibits a licensee from permitting any "illegality of any kind to take place" on the licensed premises.

The plaintiff challenges the decision of the commission on numerous grounds, including that: 1) the decision was made upon unlawful procedure (G. L. c. 30A, § 14[7][*d*]) because the notice of hearing and the decision itself cited the wrong statute; 2) in the absence of a criminal conviction, the commission does not have the authority to determine whether a licensee has violated a criminal statute and, in any event, such a determination must be made upon a standard of proof beyond a reasonable doubt; 3) the proper standards in determining obscenity were not applied by the commission; 4) actual knowledge of the obscenity by the licensee was not shown; and 5) the commission failed to state its reasons as required by G. L. c. 30A, § 11(8). We reject all of the plaintiff's claims and affirm the judgment as modified by this opinion.

1. *References to the wrong statute by the commission.* Both in its original notice of hearing dated July 24, 1979, and in its decision dated September 26, 1979, the commission referred to a violation of G. L. c. 272, § 32,[4] instead of to a violation of G. L. c. 272, § 29. We think the errors insignificant.

---

[2] In relevant part, G. L. c. 272, § 29, as amended by St. 1974, c. 430, § 9, reads: "Whoever disseminates any matter which is obscene, knowing it to be obscene, or whoever has in his possession any matter which is obscene, knowing it to be obscene, with the intent to disseminate the same, shall be punished . . . ."

[3] Regulation 21, which appears as 204 Code Mass. Regs. § 2.05(2) (1978), reads as follows: "No licensee for the sale of alcoholic beverages shall permit any disorder, disturbance or illegality of any kind to take place in or on the licensed premises. The licensee shall be responsible therefor, whether present or not."

[4] Section 32, as appearing in St. 1974, c. 430, § 13, exempts from the application of G. L. c. 272, §§ 28, 29 and 29A, certain managers. It is not a provision making conduct illegal. Section 32, as in effect prior to St. 1974, c. 430, did proscribe obscene entertainment. See St. 1910, c. 367.

The licensee was well aware of the charges made against it and concedes in its brief that it availed itself of the opportunity to review the commission's file prior to the hearing. Moreover, as found by the commission in its statement of reasons, when offered a continuance, the licensee chose to go forward. Reversal of agency action is only appropriate under G. L. c. 30A, § 14(7)(d), where "the substantial rights of any party may have been prejudiced." *Aristocratic Restaurant of Mass., Inc.* v. *Alcoholic Beverages Control Commn. (No. 1)*, 374 Mass. 547, 551, appeal dismissed, 439 U.S. 803 (1978). No such showing of prejudice, let alone substantial prejudice, has been made here by reason of the incorrect statutory citation in the notice of hearing.

Similarly, the reference to G. L. c. 272, § 32, in the commission's decision, where the commission in its statement of reasons had correctly referred to G. L. c. 272, § 29, was clearly inadvertent and nonprejudicial. A corrected notice of decision was properly issued prior to the hearing in the Superior Court.

2. *Determination by the commission of an "illegality" in the absence of a criminal conviction.* The licensee claims that whether a criminal statute has been violated can only be determined by the judiciary. This argument misconceives the purpose of G. L. c. 138. That statutory scheme which gives the commission the authority to grant, revoke and suspend licenses was "enacted . . . to serve the public need and . . . to protect the common good." G. L. c. 138, § 23, as amended through St. 1977, c. 929, § 7. "[T]he purpose of discipline is not retribution but the protection of the public." *Arthurs* v. *Board of Registration in Medicine*, 383 Mass. 299, 317 (1981). The commission is given "comprehensive powers of supervision over licensees," *Connolly* v. *Alcoholic Beverages Control Commn.*, 334 Mass. 613, 617 (1956), as well as broad authority to issue regulations. It could rationally conclude that a violation of G. L. c. 272, § 29, is an "illegality" which relates to the "proper and orderly conduct of the licensed business" (G. L. c. 138,

§ 24) requiring suspension. See G. L. c. 138, §§ 23, fifth paragraph, and 64.[5] See *Saxon Coffee Shop, Inc.* v. *Boston Licensing Bd.*, 380 Mass. 919, 928 (1980); *Olitsky* v. *O'Malley*, 597 F.2d 295, 302 (1st Cir. 1979); cf. *Aristocratic Restaurant of Mass., Inc.* v. *Alcoholic Beverages Control Commn. (No. 1)*, 374 Mass. at 554; *California* v. *LaRue*, 409 U.S. 109, 115-116 (1972); *Paris Adult Theatre I* v. *Slaton*, 413 U.S. 49, 58 n.8 (1973). Thus the commission can properly determine whether a licensee has violated G. L. c. 272, § 29, for purposes of license suspension under G. L. c. 138, regardless of the existence or outcome of any criminal proceedings. See *Arthurs* v. *Board of Registration in Medicine*, 383 Mass. at 317. We see no such usurpation of the judicial function as is urged by the licensee.

Moreover, we note that both the Supreme Judicial Court and this court have upheld suspensions or revocations of licenses on findings by licensing authorities of violations of criminal statutes. *Olde Towne Liquor Store, Inc.* v. *Alcoholic Beverages Control Commn.*, 372 Mass. 152, 153 (1977). *Aristocratic Restaurant of Mass., Inc.* v. *Alcoholic Beverages Control Commn. (No. 2)*, 374 Mass. 564, 565, appeal dismissed, 439 U.S. 803 (1978). *United Food Corp.* v. *Alcoholic Beverages Control Commn.*, 375 Mass. 238, 240 (1978). *Boylston-Washington, Inc.* v.

---

[5] The fifth paragraph of § 23 reads in part as follows:

"Whenever, in the opinion of the commission, any holder of a license . . . fails to maintain compliance with the requirements of this chapter, or any other reasonable requirements which it may from time to time make with respect to any such license . . . or to the conduct of business by any such licensee . . . it may, after hearing or opportunity therefor, modify, suspend, revoke or cancel such license or permit."

In relevant part, G. L. c. 138, § 64, as amended through St. 1979, c. 15, § 10, reads as follows:

"The licensing authorities after notice to the licensee and reasonable opportunity for him to be heard by them, may modify, suspend, revoke or cancel his license upon *satisfactory proof* that he has violated or permitted a violation of any condition thereof, or any law of the commonwealth" (emphasis added).

*Alcoholic Beverages Control Commn.*, 8 Mass. App. Ct. 396 (1979). See *Saxon Coffee Shop, Inc.* v. *Boston Licensing Bd.*, 380 Mass. at 928.

We reject, for similar reasons, the licensee's claim that the commission's determination must be upon a standard of proof beyond a reasonable doubt in these civil proceedings. General Laws c. 138, § 64, see note 5, *supra*, specifically authorizes suspension upon "satisfactory proof" of a violation. The statutory standard of review of agency action is whether the agency action is supported by "substantial evidence," G. L. c. 30A, § 14(7)(*e*), as defined in § 1(6),[6] and that standard has been consistently applied in cases where revocation or suspension of a license has been grounded on the violation of a statute or regulation. *Olde Towne Liquor Store, Inc.* v. *Alcoholic Beverages Control Commn.*, 372 Mass. at 153. *Aristocratic Restaurant of Mass., Inc.* v. *Alcoholic Beverages Control Commn. (No. 1)*, 374 Mass. at 552. *United Food Corp.* v. *Alcoholic Beverages Control Commn.*, 375 Mass. at 244. *Boylston-Washington, Inc.* v. *Alcoholic Beverages Control Commn.*, 8 Mass. App. Ct. at 398. See *Saxon Coffee Shop, Inc.* v. *Boston Licensing Bd.*, 380 Mass. at 930.

The licensee also contends that because free expression interests under the First Amendment to the Federal Constitution or under art. 16 of the Massachusetts Declaration of Rights may be implicated, see *McKinney* v. *Alabama*, 424 U.S. 669, 683-684 (1976) (Brennan, J., concurring), a finding of obscenity should be made by the commission only on proof beyond a reasonable doubt. No other authority has been cited to us for this proposition, and we are not persuaded that deviation from the statutory standard is mandated by art. 16.[7]

---

[6] "[S]uch evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1(6), as amended by St. 1979, c. 795, § 3.

[7] The First Amendment is probably not implicated. See *Aristocratic Restaurant of Mass., Inc.* v. *Alcoholic Beverages Control Commn. (No. 1)*, 374 Mass. at 551.

We note, moreover, that the decision of the trier of fact, the commission, is by no means "unreviewable," *Commonwealth* v. *Plank*, 378 Mass. 465, 469 (1979), and that, in the area of obscenity, reviewing courts ensure "the necessary sensitivity to freedom of expression," *Freedman* v. *Maryland*, 380 U.S. 51, 58 (1965), by conducting their own independent review where necessary to protect constitutional rights. *Commonwealth* v. *Plank*, 378 Mass. at 469. *Jenkins* v. *Georgia*, 418 U.S. 153, 160-161 (1974). *Smith* v. *United States*, 431 U.S. 291, 305-306 (1977). See *Miller* v. *California*, 413 U.S. 15, 25 (1973).

3. *Licensee's challenges to the finding of obscenity.* The commission, after a hearing at which three witnesses testified (Inspector Fox of the commission, Loris D'Amato, the manager of the licensee, and the manager's husband, Vincent D'Amato), found the licensee guilty of "violation of ABCC Regulation 21 — to wit Chapter 272, § 29." Its subsidiary findings are contained in its "Statement of Reasons" which, except for two short introductory paragraphs, is set forth in full in the margin.[8]

---

[8] "On the basis of the evidence presented at this hearing the Commission finds as facts:

"1. On Saturday, July 7, 1979 at approximately 9:30 P.M. an Investigator of this Commission entered the licensed premises of the above; proceeded to the bar, ordered a Schlitz beer and some peanuts, and observed the show.

"2. A black female was dancing on a small stage to the left of the bar. She stripped completely and at one point allowed a male patron to fondle her breasts. On several occasions she cupped and massaged said breasts. The female dancer laid on a blanket and applied oil to her breasts, genital area and her buttocks; all the while taking positions and making grinding motions that fully exposed her to the patrons of the bar. After approximately ½ hour she left the stage.

"3. A second dancer (female caucasian) appeared on stage wearing a black slip type garment that snapped open at the crotch and pulled up to her waist. This female dancer permitted a patron to place a dollar bill under the garment and she placed it into her vagina leaving about one inch exposed. Her body motions caused this bill to move in and out of her body.

"4. The same female dancer placed [*sic*] a patron's pipe and placed the mouthpiece into her vagina and her body motions caused it to move

3(a). The licensee first argues that since the inspector did not see the entire performance of either of the two dancers, but only a portion of each, the commission could not and did not consider the works "taken as a whole" as required by statute[9] and case law, e.g., *Roth* v. *United States,* 354 U.S. 476, 489 (1957). The uncontroverted evidence before the commission indicates that the inspector watched the first dancer for a half an hour, that he saw the second performer engage in a series of acts of sexual conduct before leaving,

about. At one point this dancer took a bottle of beer from a patron and placed the nipple of her left breast into the bottle and wet her nipple with beer and then allowed the patron to place his mouth on the nipple.

"5. The female dancer approached Inv. Fox and stated 'I'll see if I can keep this guy awake.' She then bent over and with her vagina fully exposed, proceeded to insert a net type kerchief approximately 12 inches square entirely into her vagina. She had pulled about two inches of the kerchief out and caused it to move with body motions.

"6. At this point, the Investigator left the licensed premises without making himself known. It was noted that there were approximately 40 patrons in the licensed establishment.

"7. On Monday, July 9, 1979; accompanied by Officers of the Uxbridge Police Department, Inv. Fox went to the Palm Garden and found it closed — the time was 11:00 A.M. The two went to the rear of the building and up to the apartment on the second floor. It was there that they informed the manager of record that a report on the alleged violations would be made with the Commission.

"We find that these acts were performed over a substantial period of time on the night in question, and that the person in charge of the licensed premises, at the time, permitted the performance to go on.

"Accordingly the Commission finds the licensee guilty of violation of ABCC Regulation 21 — to wit Chapter 272, Section 29 [notice reading section 32]; as charged and suspends the license of the above for a period of eight [8] days as noted."

[9] General Laws c. 272, § 31, as amended by St. 1977, c. 917, §§ 4 to 6, provides definitions, applicable to § 29, including a definition for "obscene matter":

"'Obscene', matter is obscene if taken as a whole it

(1) appeals to prurient interest of the average person, applying the contemporary standards of the commonwealth;

(2) depicts or describes sexual conduct in a patently offensive way; and

(3) lacks serious literary, artistic, political or scientific value."

that at that time a record had ended and a second record, a "slow" one, was being sought. At the time the first record had ended, the dancer had pulled about two inches of a twelve inch handkerchief from her vagina. What would be the continuation of the dance could readily be inferred. The inspector's description to the commission was sufficiently complete to give the full flavor of the performance and the commission could properly conclude that the likelihood that the unseen portions had "serious literary, artistic, political or scientific value" was remote. See *Kois* v. *Wisconsin,* 408 U.S. 229, 231 (1972) ("A quotation from Voltaire in the flyleaf of a book will not constitutionally redeem an otherwise obscene publication").

3(b). Prior to the hearing of evidence, counsel for the licensee asked the commission, "[S]tate, if you could, what the community standards of Massachusetts are." One of the commissioners replied, "[Y]ou just can't do those kinds of standards, in a vacuum" without hearing evidence. The licensee claims that because the commissioners were unable to answer what the community standards were, they were unable to determine Statewide standards and, therefore, that the licensee was entitled, under the authority of *Commonwealth* v. *Trainor,* 374 Mass. 796, 800 (1978), and *Commonwealth* v. *Mascolo,* 7 Mass. App. Ct. 275, 279-280 (1979), to a finding that the matter was not obscene.

"[C]ontemporary community standards take on meaning only when they are considered with reference to the underlying questions of fact that must be resolved in an obscenity case." *Smith* v. *United States,* 431 U.S. at 300. After hearing the evidence, the commissioners did not determine that no Statewide standards existed or suggest that the commission could not agree as to what those standards were. See *Commonwealth* v. *Mascolo,* 7 Mass. App. Ct. at 280. They did not deny knowledge of community standards, but, to the contrary, indicated that they had heard similar cases in numerous communities of the Commonwealth. Although they invited evidence of such standards from the licensee, they did not, as claimed, place the

burden of showing community tolerance of the perform-
ance on the licensee. The commissioners made clear at the
hearing that, in determining what the Statewide standards
were, they would "rely upon our own experience and judg-
ment." Such reliance is appropriate. See *District Attorney
for the No. Dist.* v. *Three Way Theatres Corp.*, 371 Mass.
391, 394 (1976) ("trier of fact may draw on his own knowl-
edge of normative views in his own community in applying
statutorily prescribed community standards").

The request for articulation of community standards was
improper and no inference of lack of knowledge may be
drawn from an inability to answer. As stated in *Smith* v.
*United States*, 431 U.S. at 308, "A request for the jurors'
description of their understanding of community standards
would have been no more appropriate than a request for a
description of the meaning of 'reasonableness.'"

In sum, the record does not support the licensee's claim that
the commission lacked knowledge of community standards.

3(c). The licensee also urges that the commission's failure
to find specifically that the three-pronged test[10] of obscenity
was met vitiates its decision. It would, of course, have been
far preferable for the commission to make subsidiary find-
ings in terms of the statutory definition, and "to state [its]
reasons for progressing from subsidiary facts to the ulti-
mate decision." *Saxon Coffee Shop, Inc.* v. *Boston Licens-
ing Bd.*, 380 Mass. at 929. However, from the commission's
findings, we think "[i]t is plain" that the dance perform-
ances were "a form of hard-core pornography well with-
in the types of permissibly proscribed depictions des-
cribed in *Miller.*" *Hamling* v. *United States*, 418 U.S. 87,
115 (1974). (*Miller* v. *California*, 413 U.S. at 25, cites "lewd
exhibition of the genitals" as one of its "plain examples".)
The description of the dance "can and does speak for it-
self." *Paris Adult Theatre I* v. *Slaton*, 413 U.S. at 56 n.6,
quoting from *United States* v. *Wild*, 422 F.2d 34, 36 (2d
Cir. 1969), cert. denied, 402 U.S. 986 (1971). We have no

---

[10] See note 9, *supra*.

"real doubt" that the commission upon a remand would again reach the same conclusion, "and accordingly that remand would be merely a waste of time." *United Food Corp. v. Alcoholic Beverages Control Commn.*, 375 Mass. at 245.

Our examination of the transcript finds substantial evidence for the commission's description of what occurred. The dances included "lewd exhibitions of the genitals" and other acts of sexual conduct as defined in G. L. c. 272, § 31.[11] See note 8, *supra*. Whether such acts were depicted in a "patently offensive" way, with reference to contemporary standards, was a question for the fact finder. See *Commonwealth v. Kocinski, ante* 120, 122-123 (1981), where on very similar facts, convictions under G. L. c. 272, § 29, were upheld. See also *Seattle v. Marshall*, 83 Wash. 2d 665, 666-667, cert. denied, 419 U.S. 1023 (1974). In this case, we cannot say that the acts complained of did not "warrant a finding that an average citizen of Massachusetts today would be repelled." Contrast *Commonwealth v. Plank*, 378 Mass. at 470.

Other claims of the licensee challenging the finding of obscenity may be readily rejected. The Commonwealth was not "obliged to present expert testimony concerning the absence of serious literary, artistic, political or scienific value in the allegedly obscene matter . . .. We have no doubt of the [trier of fact's] ability to appraise the value of such performances" without additional testimony. *Commonwealth v. Kocinski, supra* at 124-125. See *Paris Adult Theatre I v. Slaton*, 413 U.S. at 56 n.6. We do not concur

---

[11] The definition in G. L. c. 272, § 31, as amended by St. 1977, c. 917, §§ 4 to 6, is:

"'Sexual conduct', human masturbation, sexual intercourse actual or simulated, normal or perverted, or any touching of the genitals, pubic areas or buttocks of the human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex or between humans and animals, any depiction or representation of excretory functions, any lewd exhibitions of the genitals, flagellation or torture in the context of a sexual relationship . . .."

with the claim that the dances occurred in an area affording "privacy" within the meaning of *Commonwealth* v. *Scagliotti*, 373 Mass. 626, 628 (1977), or that the presence of an audience of consenting adults prohibits the finding of a violation of G. L. c. 262, § 29. *Commonwealth* v. *Kocinski, supra* at 123 n.5.

4. *Knowledge of obscenity by the licensee.* The commission made no subsidiary finding as to the knowledge of the licensee, and the only finding on this subject is the conclusory one quoted in the penultimate paragraph of n.8, namely: "We find that these acts were performed over a substantial period of time on the night in question, and that the person in charge of the licensed premises, at the time, permitted the performance to go on."

Before discussing the inadequacy of the commission's findings and reasons for its conclusion, see part 5, *infra*, and before discussing the evidence before the commission as to the licensee's knowledge or constructive knowledge, we point out that an examination of the transcript makes it clear that the reference to "the person in charge of the licensed premises, at the time" was a reference to Vincent D'Amato (Vincent).

Both D'Amatos testified. D'Amato's wife (Loris) was the manager of the premises, and held this position for a year. After January, 1979, when she had had a baby, her duties became mainly bookkeeping. Vincent testified that he had started working full time at the club about three months before. When asked his position, he answered, "I set forth the rules for the patrons and the employees." From this and other testimony, it became evident during the course of the hearing that, as put by one of the commissioners, "this gentleman" had been "running" New Palm Gardens since the commencement of his full-time employment.

The commission's finding must also be read in connection with G. L. c. 138, § 26, as amended by St. 1935, c. 440, § 24. That statute requires every corporation licensed to sell alcoholic beverages to appoint a manager to whom must be delegated "full authority and control of the premises."

Loris held that position. However, the commission recognized that, despite his wife's nominal title, Vincent was "in charge of the licensed premises" at the time of the violation.

We turn next to the evidence before the commission on Vincent's knowledge or constructive knowledge that obscene dances took place. Inspector Fox testified that on the night he visited the club he did not see either D'Amato there. Both of them also acknowledged that Vincent had not been in the bar between 9:00 and 10:30, as they had held a party upstairs in their apartment for Vincent's father.

Vincent testified to the ambiance of the dance setting and the propensities of the dancers. The stage used in July, 1979, at the time of the performances, had been built by Vincent. It was eight feet by eight feet and had a border of eleven inches designed as a resting place for patrons' drinks. Patrons sat around the stage, and Inspector Fox testified that he had been, at times, less than two feet away from the dancers. The stage was subsequently rebuilt to prevent patron-dancer touching.

Vincent indicated that he issued oral instructions to the dancers not to touch the customers, not to put anything in their vaginal or anal areas, and to get dressed before sitting with customers. When asked why he limited the dancers, he said, "[I]n speaking to other owners, they told me not to let them, they would do anything on the stage, stuff bottles up themselves, they'll do all kinds of weird things to themselves, they'll actually pull a patron on the stage if you let them." He also related, "[T]hey all tell me the same thing, that if you let them do it, if you let the dancers, they'll do anything and the patrons love it."

There was thus before the commission uncontradicted evidence that dances took place within arm's reach of customers, that the stage was designed with a border for resting drinks, that the person in charge of the premises knew that the dancers, if unsupervised, would "do anything," and that, indeed, for at least one half-hour of one dance and for considerable portions of another, dancers openly performed dances which included sexual conduct.

We think that this evidence was sufficient to support a finding that Vincent should have known that the dancers, if unsupervised, would be likely to engage in sexual acts with customers or would otherwise violate G. L. c. 272, § 29, and that "on the basis of all the surrounding facts and circumstances" he "was subject to an affirmative duty" to provide some supervision over the dancers. See *Commonwealth* v. *Rosenberg,* 379 Mass. 334, 342-343 (1979). It could be found that he authorized performances "with at least some degree of lack of care." *Olde Towne Liquor Store, Inc.* v. *Alcoholic Beverages Control Commn.,* 372 Mass. at 154. In sum, even if it cannot be inferred from the openness and length of the performances that Vincent condoned the dancers' behavior, compare *Boylston-Washington, Inc.* v. *Alcoholic Beverages Control Commn.,* 8 Mass. App. Ct. at 399, *Commonwealth* v. *Bucaulis,* 6 Mass. App. Ct. 59, 63, cert. denied sub nom. *Bucuvalas* v. *Massachusetts,* 439 U.S. 827 (1978), we think that there are sufficient factors here to find that he "permitted" the violation.[12] We consider the language in *Commonwealth* v. *Rosenberg,* 379 Mass. at 341, relating to the possible duty of the manager of an adult bookstore (see also *People* v. *Adler,* 25 Cal. App. 3d 24, 37 [Super. Ct. 1972], vacated on other grounds, 413 U.S. 912 [1972]; *People* v. *Tannahill,* 38 Ill. App. 3d 767, 772-773 [1976]), and *Commonwealth* v. *Kocinski, supra* at 124, relating to active management of a business involved in adult entertainment, supportive of our conclusion. We also note that there is substantial authority elsewhere which would construe similar language to require even less evidence of knowledge than is present in this case. *Clown's Den, Inc.* v. *Canjar,* 33 Colo. App. 212, 215 (1974). *G & B of Jacksonville* v. *State,* 371 So. 2d 138, 139 (Fla. App. 1979). *Reeb* v. *Liquor Control Bd.,* 24 Wash. App. 349, 353 (1979). *Am-Chi Restaurant, Inc.* v. *Simonson,* 396 F.2d 686, 687 (D.C. Cir. 1968).

---

[12] We distinguish this case from *Commonwealth* v. *Grant,* 7 Mass. App. Ct. 203 (1979), and *Migliaccio* v. *O'Connell,* 307 N.Y. 566 (1954), where only isolated acts of sexual conduct occurred.

5. *Failure of commission to state its reasons.* A trouble-some aspect of this case is the commission's failure to make adequate findings and to state its reasons. We have already referred to this failure in part 3, *supra.* Particularly dismal is the lack of findings with respect to knowledge or constructive knowledge of the licensee and the omission of the criteria used in determining that the person in charge (whom we regard to be Vincent D'Amato, see part 4, *supra*) "permitted" the performance to go on.

Although we recognize the arguments in favor of remand, we nevertheless conclude that sending the matter back to the commission would be fruitless, as "there is no real doubt" that the commission would again order suspension couched in the legal standards we have now articulated. *United Food Corp.* v. *Alcoholic Beverages Control Commn.,* 375 Mass. at 245. See *Katz* v. *Massachusetts Commn. Against Discrimination,* 365 Mass. 357, 363 (1974). Unlike *School Comm. of Chicopee* v. *Massachusetts Commn. Against Discrimination,* 361 Mass. 352, 354-355 (1972), where remand was required, there is here no conflicting evidence which the agency has to assess. The evidence on constructive knowledge was uncontroverted. Also, unlike *Hamilton* v. *Department of Pub. Util.,* 346 Mass. 130, 137-138 (1963), or *New York Cent. R.R.* v. *Department of Pub. Util.,* 347 Mass. 586, 593 (1964), where remand was also required, the findings to be made do not involve any expertise of the agency. We have already set forth the legal test to be applied. Applying that test, the commission would undoubtedly find that Vincent D'Amato had reason to know that the dancers, if left unsupervised, would engage in obscene performances. Accordingly, despite the unfortunate lacunae in the commission's statement of reasons, we remand the action to the Superior Court with directions to modify the judgment so as to affirm the decision of the commission. See *Duato* v. *Commissioner of Pub. Welfare,* 359 Mass. 635, 641 (1971). As so modified, the judgment is affirmed.

*So ordered.*